All rise. Hear ye, hear ye, hear ye. The United States Court of Appeals for the 11th verse is now open according to law. God save the United States and His Honorable Court. Please be seated.  Good afternoon. We're here to hear one appeal this afternoon, Hilton v. Secretary of the Florida Department of Corrections. Counsel, we're familiar with your cases, we're familiar with the briefs, the background, we've read the authorities, we've read your briefs, looked at at least portions of the record, so in the limited time that you have today, you should feel free to get straight to the heart of your argument. We're probably going to have some questions, but be mindful of the traffic lights and when the red light shines, we do want to wrap it up. But if you're answering a question from the court, you can of course finish your answer and be on our time. So Ms. Blair. Good afternoon, Your Honors, and may it please the court. I'm Katherine Blair here on behalf of Appellant Gary Michael Hilton, and I would like to focus today on issues one and two, which overlap and concern the ineffectiveness of trial counsel related to the defense team's disarray and dysfunction and counsel's presentation of conflicting guilt and penalty phase defenses. Mr. Hilton's trial representation was such, and I quote, a disaster, that it resulted in the entire Capitol unit being scrapped and restarted with new people at the Public Defender's Office. His defense team's discord was so all-encompassing that they could scarcely agree on anything, including a basic theory of defense. But there were two things that the defense agreed upon, one, that its members were barely on speaking terms and could not collaborate for a united purpose, and two, they were woefully unprepared for trial. Can I ask you what may be like the dumbest question of all time, but it just dawned on me when I was thinking about the claim here that there was a lack of a cohesive strategy between the guilt phase and the penalty phase. It seems like that would happen not infrequently. I mean, like that a Capitol defendant, that the first course of action is to say, I didn't do it, and then once he is adjudicated to have done it, to pivot in some respect to say, well, if I did it, then I didn't mean to or I was under, you know, duress or something. Is it that out of the ordinary for there to be sort of a little bit of a disjunction between the guilt phase and the penalty phase? There are instances in which it is unavoidable. However, Florida v. Nixon states that wherever possible, counsel should, when investigating a Capitol case, be looking to have cohesion between the two phases. The ABA guidelines as well, particularly the commentary to Rule 10.11, says that during an investigation, counsel should begin to develop a theme that can be presented consistently through both the first and second phases, and ideally, the theory at the guilt phase would complement the penalty phase. So there are instances, for example, when an individual is insisting on maintaining innocence, alibi, I was not there, is convicted of capital murder, and then has to proceed to a sentencing phase where it was unavoidable. Well, that's not too far off this case, right? Where Hilton was demanding that sort of this scorched earth, I'm going to make them prove every last jot and tittle. I mean, isn't that kind of this case? The record does not actually support that Mr. Hilton wished to have a scorched earth trial in the sense of maintaining innocence at all costs. Mr. Hilton had said—  Wait a minute. He wanted to plead guilty in exchange for a life sentence, couldn't get that. And so then, what I think he wanted to do, the testimony was, he was adamant he wanted to go to trial, if the state wanted to put him to death, it was going to cost them. Those statements are, yes, attributed to Mr. Hilton. Those are not necessarily synonymous, though, with an innocence defense as in, I did not commit these acts, I did not do this. Going to trial, having a guilt phase in which a more sensible defense such as involuntary intoxication was presented that was consistent with the penalty phase, making the state prove aspects of their case, prove the case, work for it, pay for getting a guilty verdict. That, that is not inconsistent with an involuntary intoxication defense. And in fact— Well, I'm sorry, counsel. Just to be clear on the record, though, because the language that the chief cited is in the record, but I thought that there were other statements, especially from other counsel at the time saying that Mr. Hilton would have gone with whatever Ms. Huber stated, that he wasn't clear what was happening in terms of the guilt phase as opposed to the penalty phase, and that especially when Officer Wynn testified, the game kind of changed and there was no real opportunity for a shift of strategy. Are those facts also in the record? Yes, they are, Your Honor. And in fact, essentially everyone except Ms. Huber testified that Mr. Hilton was deferential entirely to her trial strategy. He was an easy client. He did not need a scorched earth trial. Those statements primarily came from Ms. Huber stating that he did, but Ms. Huber's own statements on the record at the beginning of trial include a statement that she had not been able to discuss the evidence in the case with Mr. Hilton for several months, which Mr. Hilton affirms on the record. So she had not even been in a position to advise Mr. Hilton on what the evidence was showing. Then Ms. Huber additionally states after Officer Wynn was called, we would possibly not even have gone to trial had we known of this. She then, prior even to Officer Wynn being called, she had sent an email to her team on I believe February 9th, two days before, and this is in the record, Your Honor, two days before Mr. Wynn was called, stating, I'm now entertaining an involuntary intoxication defense. That was when some of the DNA evidence, physical evidence, eyewitness discussion placing Mr. Hilton at the scene had been introduced. So Ms. Huber's case was crumbling around her and she at that point knew it, but prior to trial had been insistent on going with an innocence defense above the team's opposition. Pardon me. Sorry about that. We talked at the same time. Go ahead. Well, I was going to say, and even though we don't defer to counsel's legal conclusions, the fact that Ms. Huber stated in her deposition, I believe at least three times that she was deficient and ineffective, what significance, if any, does that admission have in terms of at least the deficiency prong? I think it has great significance. I think that it bolsters what would be true regardless of Ms. Huber's admissions to deficiency. So she states the team as a whole is repeatedly stating that Mr. Hilton was not insisting on an innocence defense. He would have deferred to legal strategy. Ms. Huber's statements that she was ineffective for overlooking the testimony of Officer Wynn. She speaks about telling the jury in her opening statement that other than the fact that Ms. Dunlap's car had been found by the side of the road and the fact that there was direct evidence that Ms. Dunlap had died a tragic death, she did not anticipate any other direct evidence being admitted regarding Mr. Hilton's guilt. That was an absolutely unreasonable strategy, which she recognized in her post-conviction testimony had been torpedoed when she realized she had overlooked Officer Wynn's statement. Just briefly, to kind of rewind the tape a little bit, it seems to me the difficulty for you with respect to this claim may not be a difficulty with respect to some of the other claims where the district court says, look, we've got to like look past sort of AEDPA for procedural reasons. But on this claim anyway, you've got to tangle with AEDPA. And so if, as we were discussing earlier, there are like some statements in the record that suggest he wanted scorched earth, you know, was going to sort of maintain innocence, require the state to prove its case, and then there are some statements in the record that suggest sort of maybe not, the AEDPA difficulty for you is that you've got to show not just like on balance that you're right, but that you like can't, that no one, you know, no reasonable jurors could see it any other way, right? The record, I mean, this kind of like messy, tangled record, aren't we required to defer to the district court, I'm sorry, to the state court's determination of that, those factual issues? It is our submission that the district court's determination was unreasonable on the face of the record. Wait, the district court? You mean the state court? Pardon me, yes. I apologize, Your Honor. I led you into that error by, I said district court as well, state court, yeah. But I apologize. It is our contention that the state court's determination was unreasonable and the district court's adoption of that reasoning as not unreasonable was error. So the defense could agree on very little throughout the case. The one thing that they could agree on leading up to trial, during trial, throughout the post-conviction testimony, is that the defense had been chaos, there had been no agreement on a strategy, numerous members of the trial team testified that they did not understand the strategy, a lot of the confusion and the disarray hearkened back to Ms. Subers' spiraling, what I will term as a mental health crisis, obviously I'm not a mental health professional, but she- It seems the challenge is the prejudice. If we, let's just speaking for myself, agree that the record supports deficient performance. Can you clarify for me if we are supposed to bifurcate the prejudice as well, meaning if there was sufficient evidence in the record to support the guilty verdict, then are we just looking really at the penalty phase in terms of whether or not a life sentence would have been the result but for the deficiencies? How does that work? I have three tiers of a response, Your Honor. The first would be, had counsel presented a viable, reasonable defense, which they would have been able to do but for this disarray and dysfunction among the team, had they presented involuntary intoxication, the case very well may not have proceeded to a penalty phase. The jury could have found that Mr. Hilton was physically responsible for the death of Ms. Dunlap, but could have contextualized that crime under the involuntary intoxication defense due to Dr. Delcher's medical malpractice in prescribing a massive dose of Ritalin despite Mr. Hilton's signs of manic psychosis. So one form of prejudice is that an involuntary intoxication would have been reasonably likely to be successful. Had the case, had Mr. Hilton still been convicted of first-degree murder and had the case proceeded to a penalty phase, a consistent defense carrying from that front-ended this information about the Ritalin and Mr. Hilton's state of mind from the guilt phase into the penalty phase would have been reasonably likely to result in a different verdict. This was a unanimous case. This was a post-Ring v. Arizona case, which we know in the wake of Hurst v. Florida, all unanimous jury recommendations for death post-Ring did not receive resentencings. Every post-Ring non-unanimous death sentence that did not involve a waiver down the line received a resentencing. So since Strickland also contemplates appellate success through either the jury on the front end. So counsel had to foresee that? Counsel would foresee, oh gosh, if I don't do this right, I could get a unanimous ruling against me and someday the Supreme Court of the United States, I mean, that seems to be where you're going with this. Someday the Supreme Court of the United States will say there has to be unanimous findings and otherwise we could get a resentencing. I mean, that wouldn't have been foreseeable to any counsel at the time. That is not my contention, Your Honor. My contention is that counsel should have foreseen that a defense. So the Ring analysis has really nothing to do with this. It is my contention that it does, but recognizing that this court may disagree. How? How can it have anything to do with it? Because it's not something counsel could ever foresee. Counsel. Or we would expect them to foresee. Counsel could have foreseen that an involuntary intoxication defense in light of overwhelming evidence of guilt, this was not an alibi case. This was not the contrary. That's a different argument.  I don't see what Ring has a role in this. I believe that counsel should have known that the only reasonable strategy to potentially spare Mr. Hilton's life at all, even at the sentencing phase, not with counsel contemplating future outcomes, would have been this through line involving the mental health history. Additionally, while I think there were these two potential guilt phase different outcome that was reasonably likely, potential penalty phase outcome that was reasonably likely, our position is also that this global disarray was so pervasive and constituted a constructive denial of counsel, and so prejudice can be presumed as well. Can I ask you one question? It seems like when you started, I guess as I understood this case, there were actually two ineffective assistance of trial counsel claims. One was about discord and disarray. One was about lack of cohesion. And you kind of blended them together in the presentation here, but I think we might need to disaggregate them again, because I think the prejudice analysis, I think Judge Abudu is quite right, it works a little differently with respect to each one, right? Because for instance, on the discord and disarray claim, the district court, at least as I recall, said, I'm really only going to consider one aspect of this, which is the win aspect. The rest of it, the district court says, is just sort of like vague, conclusory, I'm not doing that. Or not presented. Not presented properly. Yeah. I'm just not doing that. And so, do you think we need to disaggregate them? I think I understand rhetorically why it works better for you to kind of lump them all together, but don't we need to disaggregate them because they are, in fact, different claims? I think there are aspects that, yes, should be disaggregated. So obviously we have presented frameworks for prejudice, for example, the presumption of prejudice related to the global disarray that would not be present in the same way with the lack of cohesion between the two phases. However... And also, it seems to me like with respect to the disarray claim, if we find ourselves limited as the district court found itself limited to the win aspect of that, then the prejudice analysis is like, well, let's not forget there was other circumstantial evidence, another confession, the sorts of things that would sort of like net out the win error, so to speak. Whereas if you blend it all together, that prejudice analysis, maybe it doesn't look exactly the same. If we are parsing it out to follow this line, the win issue in and of itself was so damaging that it was unreasonable to conclude that there was no prejudice from this particular instance. The state court below and then the district court... So let me make sure I understand something about that though. So my understanding was that counsel relied on the witness list when was not disclosed as a potential witness, and therefore they were unprepared for that. And the state court ruled that that was reasonable. Is that not what was going on here? That is not what is borne out by the record, Your Honor. The court did find that, but the record reflects and trial counsel testified in post-conviction that they had been provided with Officer Wynn's report that had been disclosed to them approximately five... Well, the report, but he was not on the witness list, was he? He... They found that the court at trial found that the prosecution had not properly disclosed it. One thing I would like to note before I make a second point is that the defense, as the prosecution recognized, had a pattern of claiming the prosecution had not disclosed information to them that in fact had been disclosed. The state actually notes during this the level of defense disorganization and how they had had to provide multiple copies of discovery because the defense kept losing them and claiming a lack of discovery. However, in addition, even accepting the finding that the state did not properly comply, the state listed Officer Wynn as one of its witnesses on the first day of WADIR, which was January 31st of 2011. At that point in time, Mary Beth Boe... The trial court gave them an opportunity to depose him, right? They did. However, the damage at this point had already been done. Contrary to what the Florida Supreme Court found and what the district court adopted, this was not an issue where the prejudice of Wynn's testimony and awareness of his testimony was the ability to impeach him or otherwise discredit him once he was on the stand. This was a structural issue. This was a broad strategic issue. Ms. Subar states when Wynn is being called, we would not have gone to trial possibly. They would have pursued an alternative defense. This is... So by the time he is called as a witness... So what was her fault though? Because as the Chief just described the record, she didn't know and it's kind of caught off guard in terms of Wynn being a witness. You're absolutely correct in terms of the evidence in the record. So what was the deficiency once she was caught off guard as to Wynn being a witness? The deficiency was in not being aware of Wynn prior to when he was called. So the other members of the defense team, Mary Beth Bohannon, Paul Saunders, they testified that Officer Wynn had been disclosed to the defense. They had overlooked it. They say, we completely overlooked it. At one point, Ms. Subar, as Ms. Subar is arguing the point, her investigator, Chris Elrich, provides her with the copy of the report from the file. So just to be clear, so the deficiency was that even though she didn't know Wynn was going to be called as a witness, she nevertheless should have been prepared on the spot? I would say the deficiency is twofold. She should have been aware of the information regardless of whether he was going to be called as a witness. She should have been aware of the information contained in his report related to Mr. Hilton's inculpatory statements, which she had received months before. She also, once he was announced nine days prior, actually, pardon me, I believe it was actually 11 days prior to him being called as a witness, she does nothing. Once he is announced as one of the state court's witnesses and she has tasked other attorneys on the team with writing down each name that the state has provided as a witness to ensure, she again does not prepare. So there is a twofold. The defense should have been aware of this. They were proceeding upon an innocence defense. Again, to close the loop, and then had she known and had she prepared, what would have happened? What would have happened? I mean, the trial court gives her an opportunity to depose him, learn everything she needs to know about him. Maybe that's a break the trial court, the state trial court gave counsel that counsel didn't deserve because of her lack of preparedness, but she got it. What difference would it have made? Had she been aware of this prior to trial commencement, they could have proceeded on a much more sensible defense, involuntary intoxication, this wholly shifted their analysis. It gets back to would have pleaded guilty to the offense and fought the death penalty, which is a lot like the cohesive strategy argument, but that all runs into the problem of the finding, at least, that he wanted to effectively a scorched earth strategy and that there at least is some evidence to support that. And if I may clarify one thing, and I had one other point prior to you making this point, the first would be an involuntary intoxication at the guilt phase. It is our position that that was not inconsistent with Mr. Hilton's wishes. That was not inconsistent with a robust guilt phase defense. But the other contention I would like to make is when is disclosed as a state's witness verbally as the state is speaking during voir dire on January 31st, he is not called until I believe February 11th. Opening statements are not until February 4th. In the opening statement, Ms. Suber says to the jury that apart from the fact that Ms. Dunlap's car had been found by the side of the road, the fact that she had died a tragic death, she did not anticipate any direct evidence of Mr. Hilton's guilt. That would not have been the case had she been aware of Officer Wynn's testimony, of Officer Wynn being called as a witness a full five days before this. It alienated the jury. Okay. Okay, Ms. Blair, you've saved some time for rubato. So let's hear from Ms. Pacheco. Good afternoon, Your Honors. My name is Christina Pacheco, and I represent the Secretary of Florida Department of Corrections. I would like to begin by clearing up some of the facts that my friend had stated regarding Issue 1 with Officer Wynn. First, it is worth noting that the trial court actually found that the state had committed a discovery violation, and that was because the state did not disclose Officer Wynn as a witness. The state listed over, I believe, 600 witnesses. Officer Wynn was not listed as a witness. And while Ms. Blair is correct that the report was disclosed a few months prior to the trial, it was buried. It was a two-page report buried in a few hundred pages of documents labeled duplicate reports. And because that was the first time that that specific report was given, it was just overlooked. And there was no statement that this witness would be testifying as to any of the defendant's statements that he made. So the state court found that to the extent that there was a surprise by this testimony, it was because of the state's failure to disclose Officer Wynn as a witness, and that finding should be owed deference by this court. In addition, contrary to what Ms. Blair had said, a misserver did not do nothing once the witness was known. During voir dire, it is correct that Officer Wynn was listed or disclosed, announced that he would be one of the witnesses. The first thing she did was she objected on the ground that it had not been properly disclosed and got an opportunity to depose him and a ruling that in fact the state had violated its obligation. Yes. Which sounds pretty effective. Yes, Your Honor. But even before that, Your Honor, she actually, once she heard the name during voir dire, she went back to her office. She, so Officer Wynn, the statement was overheard from the defendant, Gary Hilton, being made to another inmate, I believe his name is Fred Sumner. So she started looking into Mr. Sumner to try to see if she could verify that what Officer Wynn was testifying was correct. She also tried to get into the jail to see, because I believe Officer Wynn said he would press a button and he was able to overhear what the conversations were within the pod. So she tried to look into the mechanics of, well, could he actually overhear? She wanted to get reports from the maintenance of the sound system. So there were plenty of things that she did right on the very day that she found out that this was a potential witness. The record also reflects that during opening statements, she had Officer Wynn's folder on her table, and she was going through it, and the state said, oh, so you do know about him? And she said, well, yes, now I do. But when he was called, she, as Your Honor stated, promptly objected, said that he was not disclosed as a witness, we are not prepared, and was provided additional time to talk with him. She did talk with him. She also planned on deposing him, but found that everything that she needed, there wasn't a deposition required. But she did strenuously object. So she did everything that she could have under the circumstances, and that did not, did not... Is there something in the record that says she then went to her client and said, the facts have changed, we need to think about our trial strategy moving forward? Would you agree that that would be, that would then be everything she could have done, and that that did not happen? I don't believe that was specifically asked of her, if she, if she discussed the statement with Mr. Hilton. However, the record reflects that she had many conversations with Mr. Hilton. They were meeting with him frequently, and from the very beginning, Ms. Serber was on this case when Mr. Hilton was still in Georgia. She traveled to see him, and from the inception, he said, I either want a life sentence, or I'm going to trial, and I want the state to prove his case, prove its case. And that was throughout the entire case. She even told him, there is so much evidence against you, it's 99, I'm 99, 99% sure that you are going to be convicted as charged, to try to convince him into a plea. And he, he said, no, I, I want to go to trial. Again, there's other evidence in the record suggesting that he was not as adamant as the state maintained. So I guess, again, my question is, once Wynn's testimony was formally in the record, and it was clear that the evidence against Mr. Hilton had moved, arguably, from circumstantial to direct, was there not an obligation at that point that was missed to determine whether or not the trial strategy should continue? I don't believe so, Your Honor, because that didn't change the trial strategy in any way. And while there was evidence from other attorneys saying that Mr. Hilton was an agreeable person, the evidence in the record from his, his lead counsel and his co-counsel were always that he wanted the state to prove its case. And there's findings from the state court that he had always maintained on having an adversarial testing by trial. So I don't think that would have impacted, and it, it, it couldn't have impacted the, the case. I know Judge Newsom asked, what's, what's the Chief Judge, oh, I'm sorry, Chief Judge Pryor asked. Oh, yeah, I like Chief Judge much better. Excuse me. Chief Judge Pryor asked, what, what's the difference then, what it, what's the difference that it would have made had she known about it sooner? And, and the answer to your question, Your Honor, is, is nothing. It didn't make any difference given the evidence in this case. This wasn't the only statement that Hilton made. He also made statements about the fact that he was hunting. And there's very strong DNA evidence in this case. The DNA of the victim was on his shoes. The victim's DNA was on his sleeping bag and his hand. Again, assuming, again, just speaking for myself, that the guilt phase, there's really no question there given the, the evidence. I'm, again, concerned about what happens at the penalty phase given the disarray. And to Judge Newsom's point, yes, it is not unusual that counsel within a case will disagree as to strategy. What does seem unusual is what was testified to, that there was no coordination, there was no collaboration, there was no communication, and essentially, he had almost two different cases within one case. How do you explain that as not being prejudicial? And then my last point is especially if my understanding is that he was already convicted of a murder charge but sentenced to life. So if that is the case, then why is it not possible that he would have instead gotten life here too? Okay, Your Honor, to, I will answer your, your last question first. So the, the life sentence was from the Georgia murder and he actually pled to that while he was in Georgia before he was extradited to Florida. So Georgia offered him a life sentence in exchange for him to provide information about the murder he provided. The murders were very similar. The body was decapitated. So he led law enforcement to, to where the head was and that was all part of his plea agreement. So he also told him where the bayonet was? Yes, yes, which was, yes, Your Honor, which was linked to the tire marks in this case. But so he, he had already done that in Georgia. So when he approached this case from the very beginning, he wanted to do the same thing. And the record is very clear that, that that is what all along he was insisting on getting the life sentence. But his attorneys were essentially, they said, we got to the point where we were begging the state and the state would not budge. They were not going to offer him a life sentence. And this is, you know, if you look at a life sentence for one murder, they're going to try him for this one. It's going to be death or nothing. Exactly.  Yes. And so I believe that answers your second question as to the, well, no, because that is saying that the state had control over the outcome, which it didn't. It eventually went to the jury and then the judge. So why is it unreasonable to conclude that he could have, at least for a similar murder charge, as you just described it, gotten life instead of death? Well, Your Honor, the state would not offer him life. I believe they did discuss having an open plea to the court and Hilton did not want to do that. Again, I understand the state's position. I'm talking about now the jury, right? That's why you get aggravating and mitigating and all of that. So now it's out of the state's hands in terms of what the actual sentence would be. Why is it unreasonable to believe that a jury would have still imposed death, but for the deficiencies? Well, Your Honor, this had six extremely weighty aggravators. The mitigation was minimal and the theory really was that the defendant had a troubled childhood, but he had issues. But for the most part, it was the Ritalin that really tipped him over the edge. And the state refuted that and showed that he actually had instances of illegal activity and misconduct well before he was prescribed the Ritalin. So that, and that kind of, I know this isn't directly part of your question, but that shows why also for the guilt phase, why that evidence would not have, that theory was just not a viable theory because it would have been rebutted by the very damaging evidence from the state's expert, Dr. Pritchard, and also the evidence showing that he knew what he was doing. He was hunting. He was using her ATM card. So that was why it was not, and his attorney said that was not a viable defense to bring into the guilt phase. But as to the penalty phase, I mean, this is really just the worst of the worst. You have a similar murder that he occurred right before, a similar manner. He kidnapped the victim, kept her for days before. And I'm not, and I'm not debating how egregious his crimes were, but we're here to determine whether or not there was deficient performance that was prejudicial. And I'm trying to understand in terms of the standard, and maybe I'm not articulating the standard correctly, that the standard requires us to also consider whether or not a life sentence would, could have been the outcome, but for the deficient performance, not whether or not there was enough evidence to support a death. Or is that a misstatement of the law that I'm making? Well, Your Honor, I believe that it would be that the deficiency, there's a reasonable, the deficient performance led to the, a reasonable probability that the outcome would have been different. And to have a life sentence all the way through to the guilt phase, I mean, there's nothing that the attorneys could have done that would have impacted. So if we're looking at the prejudice prong, there's nothing that would be different. There's nothing that you could point to. They're not saying that there should have been, this claim doesn't have like different mitigations should have been presented, or there was an error as to what was, if we're looking at it in terms of not the plea aspect, but what happened in the penalty phase, there's nothing linking the, the two, the alleged deficient performance, which we believe wasn't even established, and the impact of that deficient performance on the prejudice aspect. I don't, I understand what Your Honor is saying as to a different outcome, but I don't see how we can even get there based on the allegations. What, what the, what the prisoner is identifying as the acts of deficiency. Yes. If one has to lead to the other, is, is what you're trying to say? Yes, Your, yes, Your Honor. That the, based on the deficiency that has been alleged, how that would impact and even be part of the analysis of the prejudice prong. In terms of, you know, whether he would have accepted a life offer, we would, we would have the same outcome. It would be a life, a life sentence, and. Can I, can I ask you a question, just to, to make sure that I'm not losing the thread? The discussion that we're having now sounds like a de novo determinate, redetermination of a Strickland analysis, Strickland analysis. I thought on this claim anyway, again, the other claims may be different for reasons the district court identified, but I thought on this claim, the thing that we're here to decide is whether the state court acted unreasonably in concluding that Strickland wasn't met. Not whether Strickland is met. That's exactly correct, Your Honor, and the deference is owed to the state court's decisions. And while there are, you know, little instances in the record that my friend has pointed to, to try to contradict the state court's findings, in order to overcome that burden, there must be clear and convincing evidence, and that just has not, there's no, we're not even close to, to showing that in this case. Well, what about the, let's get to the jury challenges in terms of forecausing venue. Would you agree that the district court's statement regarding a requirement that actual bias be shown with respect to a juror was an incorrect statement of the law? We're talking about the district court? I saw that in the Supreme Court of Florida decisions as well, that the state court was using an actual bias standard, even though we have clearly stated, I think it's Guardado, that that is an unusually, unreasonably high burden to place on a defendant under Strickland. So, at least, do you concede that that was an error or not? No, Your Honor, I do acknowledge that the Caritelli-type language was used. However, in this, and I acknowledge certainly this court's decision in Guardado. So, we have to review that de novo, whether there was prejudice. Well, I don't believe Your Honors even have to go there because the claim as it's raised is an ineffective assistance of appellate counsel claim. So, I believe that Your Honors could avoid completely the Guardado issue because that comes into play when the court was discussing the viability of a motion for change of venue. But when you're looking at it, it should be removed. We're looking at it from the appellate counsel perspective, whether appellate counsel was ineffective for not raising the claim on appeal. And I don't believe that this court needs to even get into the Guardado prejudice prong analysis because it is appellate counsel, ineffective assistance. Well, please unpack that. If appellate counsel, let's say, didn't raise the claim and therefore didn't preserve the claim because of this actual bias requirement that doesn't exist, but that was nevertheless imposed, how is that not problematic, even if the claim is against appellate counsel? Well, Your Honor, the appellate counsel would have to have a preserved claim to raise in the first place, and the change of venue was never even preserved. So, I believe that this court can just look at the deficiency aspect of it and find, you know, this court has long said that an appellate counsel can't be ineffective for failing to raise a meritless claim. And here, because it wasn't preserved, there really was no claim to raise. So, I think we can avoid that issue altogether. I know the district court felt, you know, in an abundance of caution, did conduct a de novo review. But I think the easiest way for this court to handle that case or that this claim would be the court, the Florida Supreme Court found that there was no deficient performance or prejudice, and that is a result that this court can affirm. By the appellate counsel or by the trial counsel? The court in the very end of the opinion found, and therefore, because of all this, there was no ineffective assistance of the appellate counsel. So, this court can rest on that result, and we can avoid bodardo altogether. So, well, humorous. Let's assume that we get to where the, you know, to where we actually are thinking about this de novo. What's your argument on the merits? On the merits. So, well, first, there would have to be a meritorious claim that the appellate counsel was ineffective for failing to raise, which there wasn't because it was never preserved. But let's say it was preserved and appellate counsel didn't, well, I don't even think we need to say it wasn't preserved. Appellate counsel didn't raise it and should have raised it. Well, they couldn't have succeeded because it wasn't a preserved claim. So, it's a circular argument, but I think. But even, let's say it was preserved. Yeah. Okay. Okay. Preserved by trial counsel. If appellate counsel had raised it, and we're reviewing it de novo, how would you analyze the prejudice? Isn't this about media coverage? It's about media coverage. So, you would have to look at. That happens like a few years after the media coverage. Yes, Your Honor. So, we would have to look at the impact that the media coverage had. Not necessarily showing like actual bias of a juror, but how did the media impact, the media coverage. During Vordar, were the jurors or the Venari members asked about the media coverage and their knowledge of the case? Yes, Your Honor. All of the jurors who had knowledge of any sort of, anything that occurred in Georgia or any crimes in North Carolina in terms of convictions, arrests, were removed for cause. Some jurors remained that had some basic knowledge that he had been a suspect or that he had been linked to the Cheryl Dunlap murder, but they were given an opportunity for further questioning. And the court took it on a case-by-case basis. But there was no difficulty in terms of seating a juror or a jury. A jury that said that they could give him the presumption of innocence. Exactly, yes. And in fact, the only juror claim that was fully preserved in terms of the cause and peremptory challenges were regarding Juror Rice. And that wasn't based on her media coverage. It was based on her views of the death penalty. So in terms of the impact that the media coverage had for the motion for change of venue, again, there's just, there's nothing linking it to show that there was prejudice, regardless of the standard that this court uses. It's just not there. And even if we are reviewing this issue de novo, in the sense that we're not applying at pedeference, what standard of review would have applied to a preserved claim that the state trial court should have granted the motion to change venue? I believe that's an abuse of discretion view for the trial court purposes. Now that would be different. This goes to the Chief's prejudice point, I think. I mean, you know, sort of the question at base is, was the argument that was allegedly failed, that the trial counsel allegedly failed to preserve, was that remotely a meritorious argument? Oh, I'm sorry. I misunderstood the question. So it would be reviewed if the appellate argument would be reviewed for fundamental error because it was not preserved. Is that what Your Honor was asking? If you're looking at the, if we're assuming that it's preserved, the trial court's decision that there wasn't sufficiently pervasive pollution by the media coverage, that would have been reviewed, I think I understand, for abuse of discretion? Are we talking about on appeal? Yeah, if there was a normal appeal. Failure to raise the preserved issue is what we're assuming. We're assuming it's preserved. I don't believe so. I believe that abuse of discretion comes in at the trial court level. No, no, I'm sorry. It would, yes, it would be. Sorry, I'm confusing the layers. I'm not trying to trip you up. And just so I put all my cards on the table for your adversaries, I mean, I guess what I had thought you would say is, okay, look, if you're going to push me into a corner and tell me you've got to review this thing de novo, then I still have a really strong argument, A, because Strickland is very deferential, B, because the standard on venue change is very deferential, and C, because that decision would have been reviewed for abuse of discretion anyway. It's sort of this like triple-barreled difference. Yes, yes, that's entirely correct, Your Honor. Just in fairness, like that's, to your adversaries, like that's sort of where I kind of land on this. Yes, yes, and I'm sorry, you're entirely correct. The fundamental error was, if we're looking at it, unpreserved, but had it been preserved, the Florida Supreme Court would be reviewing it for the abuse of discretion standard, and there's just— Because we're in federal habeas, it would be reasonable probability of a different outcome.  Right. Yes. That's helpful, thank you. Were there any other questions as to this issue or any of the other issues? No. All right. Well, Your Honors, I appreciate your time today, and I would just like to request that this Court affirm the denial of habeas relief. Thank you. Thank you, Ms. Pacheco. Ms. Blair, you've saved eight minutes. Good afternoon again. Regarding briefly, I would like to speak about the change of venue IAAC claim, and this was a case where, if Judge Newsom, under a preserved Strickland analysis, this was a case where a local media poll had been televised showing that 100 percent of respondents responded that Mr. Hilton should receive the death penalty if he was convicted of this murder. There were 20,000 pages of media articles, internet commentary, extremely inflamed public passions. And while this Court below found that a large amount of this that was presented that was close in time to trial was, quote, unquote, internet chatter, this is reflective of the public sentiment. This, even more than media reports in and of themselves, shows that this was a community that was highly inflamed, that was highly likely to be biased. And so this is the rare case where it was an abuse of discretion not to change venue. Well, why isn't the District of the Courts questioning of the jurors? I'm thinking, I think, of Ms. Rice in particular, who the record could suggest that she might have been confused as between guilty and imposing a death sentence. And the Court's additional questions helped to tease that out. And at the end, she said, yes, I can be fair in deciding what is the appropriate sentence, assuming guilt is found here. Why is that not in a sufficient rehabilitation of that juror, for example? So in our briefing, we separated out Juror Rice's predisposition towards death from the change of venue claim. That was related to an independent cause challenge based on her personal previously held beliefs that if premeditated murder was proven beyond a reasonable doubt, and if there was a confession, death would automatically be her verdict. The trial court, prior to what the courts found to be rehabilitation below, had expressed concern, even saying that the trial court was concerned that this was an automatic vote for death. While Juror Rice made general statements about not having a problem following the law related to capital trials and responded to very general questions from the defense, she did not walk back the specific statement about her predisposition. And so that is her bias. As to the change of venue issue. Yes, I think it was Mr. Harrison maybe that was questioned about the media exposure, or who in particular are you talking about? Jurors, so our contention related to the change of venue claim is that the issue is the extent and nature of any pretrial publicity and the difficulty encountered in selecting a jury. Our contention is that the trial court was not taking into account the prejudicial information that the jury had been exposed to and the general veneer. I understand. I guess I'm asking about particular jurors because at that point, you're picking a jury and it did seem and I thought it was a Mr. Harris or someone else who was specifically asked about exposure to media coverage. Didn't know a lot of the details. Again, it seems like the court did try to tease out any bias or concern about exposure recognizing. I mean, this was a case that got national attention. How realistic is it? Was it to hope that you would have someone who would have been completely ignorant as to what happened? I think it is realistic to expect that outside of Leon County where the sentiment was so profound. It was a nationally, you know, it was a case that received national attention, but there was such an inflamed and an excessive amount in Leon County specifically. It would have been reasonable to think that outside of Leon County and the second judicial circuit, there would have been a better likelihood of finding an unprejudiced jury. And one thing that the court did do is strike for cause the jurors who knew of Mr. Hilton's convictions for the out-of-state murders, but not the charges. And under Florida law, one of the cases is Wilding and another I believe is Jackson V State. Those deal with reversible error where the jurors had been exposed to information related to other charges and not just specifically convictions. The other thing is a juror's, you know, a juror's bare assertion that they can follow the law is not sufficient. So that is our position with relation to the change of venue issue. I realize that I'm running a bit short on time, so I wanted to respond to a few points about first Ms. Suber's actions related to Caleb Wynn. Five days after Wynn is disclosed during and listed as a witness during jury selection, Suber makes an opening statement to the jury saying there's no direct evidence of Mr. Hilton's guilt. Had she investigated Wynn properly, had she prepared for this, that statement would have been inexplicable. The day before that, she announced that she had not had the chance to discuss the evidence in the case with Mr. Hilton for many months. Two days before Wynn is called, she's talking about suddenly changing course to involuntary intoxication, but again, has done nothing to prepare for this. This entire time, the defense has done nothing to prepare for this as a guilt phase issue. And if I may speak to Mr. Hilton's views, and Ms. Suber did indeed see Mr. Hilton immediately, you know, very shortly after his indictment, she went up to Georgia. Steve Bean, one of the original second chair attorneys who eventually withdrew because he could not work with Suber due to her personal spirals, he stated that Mr. Hilton was not insisting on innocence. He was there in that initial meeting. He said, had Mr. Hilton been when he was specifically questioned about this scorched earth, maintaining innocence, challenging absolutely everything strategy. He said, had Mr. Hilton expressed that desire, he would have directly spoken to him at that about the pitfalls of doing so and the way that that would impact the penalty phase. So that is at the inception. This is consistent throughout the representation, even after Mr. Bean has left the case. Beatriz Fuentes speaks to this. Maribeth Bohannon speaks to this. Paula Saunders speaks to this. Ms. Suber even states in post-conviction testimony that nobody had spoken to Mr. Hilton about the penalty phase after Rob Friedman took and the strategy after Rob Friedman took over responsibility for the penalty phase. Once Ms. Suber was expressed being unfit to do so, that occurred 60 to 90 days was the estimate prior to trial. So nobody has been speaking to Mr. Hilton for months. Nobody has been addressing this. If if Ms. Suber is realizing that there is an extremely inflammatory statement that is about to be testified to, which is different in character from Mr. Hilton's other statements, which, while upsetting, are consistent with this through line of a mental health defense. He states, I got old. I got sick. I flat lost my mind. I couldn't get a grip on it in the midst of what is a rambling statement. What Wynn is testifying to is cold. It seems calculated, remorseless. It is making a joke about Ms. Dunlap's severed head. This is a completely different type of issue. She should have been discussing this with her client and making decisions accordingly. Thank you, Ms. Blair. We're adjourned for the day.